UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATURAL GROCERS, et al.,

           Plaintiffs,

      v.

THOMAS VILSACK, et al.,

           Defendants.

Case No.  20-cv-05151-JD

**ORDER RE SUMMARY JUDGMENT**

In 2016, Congress amended the Agricultural Marketing Act of 1946 to enact the first national mandatory bioengineered food disclosure standards.  *See* 7 U.S.C. § 1639 (the disclosure statute).  The purpose of the disclosure statute is to establish uniformity in the way that bioengineered food is labeled and described to consumers.  Plaintiffs are retail stores that sell natural and organic food products, and organizations engaged in food safety advocacy.  Defendants are the United States Department of Agriculture (USDA), the USDA Secretary, and the Administrator of the Agricultural Marketing Service (AMS), which is a USDA agency responsible for the marketing of agricultural commodities, among other programs.

Plaintiffs filed a 115-page amended complaint that alleges a number of challenges to the disclosure statute and implementing regulations promulgated by the USDA.  Dkt. No. 19.  In pertinent part, plaintiffs challenge under the Administrative Procedure Act, 5 U.S.C. § 706 (APA), regulations that:  (1) permit a text message disclosure option as an alternative to an electronic or digital link disclosure; (2) require disclosures to use the word "bioengineered"; and (3) exclude highly refined foods that do not contain detectable amounts of modified genetic material.  Plaintiffs also say that the word-use regulations restrict their speech in violation of the First and Fifth Amendments to the United States Constitution, and that a provision in the disclosure statute

1  preempting state labeling laws for genetically engineered (GE) seeds violates the Tenth

2  Amendment.

3        Plaintiffs filed a motion for summary judgment, Dkt. No. 54, which the government

4  opposed, Dkt. No. 56.  The Court granted applications to intervene by the United States Beet

5  Sugar Association, the American Sugarbeet Growers Association, and the American Farm Bureau

6  Federation, *see* Dkt. Nos. 29, 46, and intervenors filed a consolidated opposition to plaintiffs'

7  summary judgment motion.  Dkt. No. 57.

8        Summary judgment is granted in favor of plaintiffs under the APA for the text message

9  disclosure regulation.  In all other respects, plaintiffs' motion is denied.

10                                    **BACKGROUND**

11  **I.     THE DISCLOSURE STATUTE**

12        The salient facts are undisputed.  In 2016, in response to the adoption of state laws

13  regulating the labeling of GE and genetically modified (GM or GMO) food and seeds, Congress

14  amended the Agricultural Marketing Act of 1946 to establish the first-ever national standard of

15  consumer disclosures for bioengineered foods.  AR248811.[1]  Congress declared that the purpose

16  of the disclosure statute was "to preempt state and local actions that mandate labeling of whether a

17  food or seed is genetically engineered, and establish a mandatory uniform national disclosure

18  standard for human food that is or may be bioengineered."  *Id.*

19        As used in the disclosure statute, "bioengineering" with respect to a food means a food

20  "(A) that contains genetic material that has been modified through in vitro recombinant

21  deoxyribonucleic acid (DNA) techniques; and (B) for which the modification could not otherwise

22  be obtained through conventional breeding or found in nature."  7 U.S.C. § 1639(1).  "Food" takes

23  the definition in 21 U.S.C. § 321(f) of "(1) articles used for food or drink for man or other animals,

24  (2) chewing gum, and (3) articles used for components of any such article."  *See* 7 U.S.C.

25  § 1639(2).  A "food derived from an animal" may not "be considered a bioengineered food solely

26  because the animal consumed feed" containing bioengineered substances.  *Id.* § 1639b(b)(2)(A).

27

28  _____
[1]  All citations to the administrative record (AR) are in Dkt. No. 59.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Congress did not specify a threshold of "the amounts of a bioengineered substance" in a food to

2   trigger a bioengineering classification.  *Id.* § 1639b(b)(2)(B).

3        Congress directed the USDA to implement regulations "with respect to any bioengineered

4   food and any food that may be bioengineered," and to "establish such requirements and

5   procedures as the [USDA] determines necessary to carry out the standard."  *Id.* § 1639b(a).  The

6   statute mandates that "[a] food may bear a disclosure that the food is bioengineered only in

7   accordance with regulations promulgated by the [USDA] in accordance with this subchapter."  *Id.*

8   § 1639b(b)(1).

9        Congress issued a number of specific directives to the USDA for the regulations.  Among

10  others, Congress required that a bioengineering disclosure on labels for consumers take the form

11  of "a text, symbol, or electronic or digital link," with the "disclosure option to be selected by the

12  food manufacturer."  *Id.* § 1639b(b)(2)(D).  It required that the electronic or digital link be

13  accompanied by "on-package language" indicating that the link provides access to food

14  information, along with "a telephone number that provides access to the bioengineering

15  disclosure."  *Id.* § 1639b(d)(1), (4).

16       The disclosure statute also directed the USDA to "conduct a study to identify potential

17  technological challenges that may impact whether consumers would have access to the

18  bioengineering disclosure through electronic or digital disclosure methods."  *Id.* § 1639b(c)(1).  If

19  the study determined "that consumers, while shopping, would not have sufficient access to the

20  bioengineering disclosure through electronic or digital disclosure methods," the USDA was to

21  "provide additional and comparable options to access the bioengineering disclosure."  *Id.*

22  § 1639b(c)(4).

23       In addition to the consumer disclosure elements, the statute contains a section that

24  preempts state labeling laws for GE food and seeds.  This section declares that "[n]o State or a

25  political subdivision of a State may directly or indirectly establish under any authority or continue

26  in effect as to any food or seed in interstate commerce any requirement relating to the labeling of

27  whether a food (including food served in a restaurant or similar establishment) or seed is

28  genetically engineered (which shall include such other similar terms as determined by the

3

[USDA]) or was developed or produced using genetic engineering, including any requirement for claims that a food or seed is or contains an ingredient that was developed or produced using genetic engineering." *Id.* § 1639i(b).  Plaintiffs acknowledged in a reply brief that the preemption provision properly regulates private actors with respect to food labeling, but they challenge preemption with respect to seed labeling.  Dkt. No. 58 at 18-19.

## II.    THE DISCLOSURE REGULATIONS

The USDA delegated to AMS the task of formulating regulations responsive to Congress's directives.  83 Fed. Reg. at 65814.  To that end, AMS posted 30 questions for public comment on its website in June 2017, and received over 112,000 responses.  AR282-90; 83 Fed. Reg. at 19860. In May 2018, AMS published a notice of proposed rulemaking, and received approximately 14,000 comments.  83 Fed. Reg. at 19860, 65814.  AMS published the final regulations in December 2018, with a mandatory compliance date of January 1, 2022.  *Id.* at 65814; 7 C.F.R. § 66.1.

The regulations apply to a "regulated entity," which is defined as "the food manufacturer, importer, or retailer that is responsible for making bioengineered food disclosures under § 66.100(a)."  7 C.F.R. § 66.1.  A manufacturer or importer is responsible for disclosures for foods that are "packaged prior to receipt by a retailer."  *Id.* § 66.100(a)(1).  A retailer is responsible for foods the retailer packages itself, or sells in bulk.  *Id.* § 66.100(a)(2).  The retailer plaintiffs, Natural Grocers, Good Earth Natural Foods, and Puget Consumers Co-op, are regulated entities to the extent they package or sell food in bulk in their stores.  *See id.*

### A.    The Electronic Disclosure Study

AMS hired Deloitte Consulting to conduct the study on the accessibility of the electronic disclosure mandated by Section 1639b(c)(1) of the statute.  *See* AR250043-118.  The study found that "key technological challenges," including a lack of technical knowledge and a lack of infrastructure, "prevented nearly all participants from obtaining the information through electronic or digital disclosure methods."  AR250046.  It also found that the telephone numbers accompanying the electronic disclosure "do not provide a viable means of accessing the bioengineering disclosure."  AR250091.  The study recommended "on-package identification,"

4

such as "a landline-enabled bioengineering disclosure" with "24-hour disclosure information via an automated recording," and "a text message alternative for consumers who have access to a mobile phone."  AR250111.

Based on the study, AMS concluded that "consumers would not have sufficient access to the bioengineering disclosure through electronic or digital means under ordinary shopping conditions at this time."  83 Fed. Reg. at 65828.  To improve consumer access to the bioengineering information, and to satisfy Congress's directive to "provide additional and comparable options to access the bioengineering disclosure," 7 U.S.C. § 1639b(c)(4), AMS created a fourth disclosure option of text messaging separate from the electronic disclosure method.  83 Fed. Reg. at 65828-29; 7 C.F.R. §§ 66.100(b)(4), 66.108.

The final regulations provide that regulated entities can comply with the disclosure requirement by adding one of the following to a food label:  (i) the statement "Bioengineered food" or "Contains a bioengineered food ingredient" (the text disclosure); (ii) a symbol that says "bioengineered" (the symbol disclosure); (iii) an electronic or digital disclosure link and accompanying text (the electronic disclosure); or (iv) text message instructions (the text message disclosure).  *Id.* §§ 66.100(b)(1)-(4), 66.102, 66.104, 66.106, 66.108. [2]

For the electronic disclosure, a food label must have an electronic or digital link printed on the label, and the link must be accompanied by the statement "Scan here for more food information" and "Call [1-000-000-0000] for more food information."  *Id.* § 66.106.  The link must connect directly to a product information page that includes the text disclosure or the symbol disclosure, and the page must exclude marketing and promotional information.  *Id.* § 66.106(b).

For the text message disclosure, a food label must say "Text [command word] to [number] for bioengineered food information."  *Id.* § 66.108(a).  The number must send "an immediate response to the consumer's mobile device" with the text disclosure or the symbol disclosure, and the response must not contain any marketing or promotional information.  *Id.* § 66.108(a)-(c).

---

[2] The regulations also provide alternative disclosure options for small food manufacturers and for small packages pursuant to 7 U.S.C. §§ 1639b(2)(E), (F).  7 C.F.R. §§ 66.110, 66.112.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### B.      Mandatory Disclosure Terminology

In the notice of proposed rulemaking, AMS proposed the use of the term "bioengineered" in all disclosures because the "statutory term, 'bioengineering,' adequately describes food products of the technology that Congress intended to be within the scope of the [regulations]."  83 Fed. Reg. at 19871.  The statute itself did not require the use of any particular words.

A number of commenters objected to this proposal, and said the disclosure language should include GE or GMO because those terms are better understood by consumers.  *See id.* at 65851-52.  Some commenters suggested that disclosures should include "may be bioengineered," but others said that would be confusing.  *Id.* at 65827, 65852.

After reviewing the comments, AMS decided to require "bioengineered" in all disclosures.  *Id.* at 65827, 65852-53; 7 C.F.R. §§ 66.100-66.108.  The agency declined to use "may be bioengineered" as vague and likely to be confusing.  83 Fed. Reg. at 65827, 65852.  AMS was a bit more ambivalent about GE or GMO, but "ultimately determined that bioengineering and bioengineered food accurately reflected the scope of disclosure and the products and potential technology at issue."  *Id.* at 65837.  In the view of AMS, GE or GMO might "create inconsistencies with the preemption provisions or muddy the scope of disclosure," and limiting mandatory disclosure language to bioengineered would provide "disclosure consistency" and minimize "marketplace confusion."  *Id.* at 65837, 65851.

AMS took some pains to emphasize that the mandatory disclosure language is intended to be a floor, not a ceiling.  As minimum requirements, the text disclosure must say "Bioengineered food" or "Contains a bioengineered food ingredient," and the symbol disclosure must use the word "BIOENGINEERED."  7 C.F.R. §§ 66.102(a), 66.104(a).  Even so, as detailed in the ensuing First and Fifth Amendment discussion, regulated entities are perfectly free to make additional statements about bioengineered foods so long as they are consistent with federal laws generally. 83 Fed. Reg. at 65852; 7 C.F.R. § 66.118; *see also* Dkt. No. 56 at 28 (government brief acknowledging same).

### C.      Regulatory Definition of "Bioengineering" and Highly Refined Foods

In the notice of proposed rulemaking, AMS called for comments on what bioengineered should mean in light of the statutory definition of "bioengineering."  83 Fed. Reg. at 19862-63; *see also* 7 U.S.C. § 1639(1).  AMS presented two "positions" as options.  Position 1 defined "bioengineering" to exclude highly refined food products that might have used genetically modified ingredients, but do not have detectable levels of modified genetic material in the final product sold to consumers.  83 Fed. Reg. at 19862-63.  Such ingredients include sugar derived from genetically modified sugar cane and sugar beets, corn starch and corn syrup derived from genetically modified corn, and soybean oil derived from genetically modified soybeans.  *Id.* Position 2 defined bioengineering to include all foods produced using bioengineering technology or genetically modified ingredients, including highly refined products that do not have detectable modified genetic material.  *Id.* at 19863.

The position proposals elicited divided comments.  *Id.* at 65833-37.  Supporters of Position 2 argued that consumers are more concerned about the use of bioengineered crops than whether the products derived from those crops contain detectable modified genetic material.  *Id.* at 65834-35.  Proponents of Position 1 stated that scientific studies have demonstrated an absence of modified genetic material in highly refined foods as the result of processing, and expressed concern that mandating disclosure for all refined products would disparage biotechnology and impose undue compliance costs on regulated entities.  *Id.* at 65833, 65836.  Critics of Position 1 took issue with the detectability point and noted that testing methods would likely improve over time to reveal the presence of previously undetectable modified genetic material.  *Id.* at 65834. The concern is that a detection standard would allow refined foods containing modified genetic material to be sold unwittingly to consumers today.

In the final regulations, AMS adopted a modified version of Position 1.  It defined bioengineering to exclude foods with undetectable modified genetic material.  *Id.* at 65816-17; 7 C.F.R. § 66.1.  AMS also created something of a safety net by adopting a "List of Bioengineered Foods," which are crops and food ingredients presumed to be bioengineered.  7 C.F.R. § 66.6; 83 Fed. Reg. at 65826.  The current list comprises "[a]lfalfa, apple (Arctic™ varieties), canola, corn,

cotton, eggplant (BARI Bt Begun varieties), papaya (ringspot virus-resistant varieties), pineapple (pink flesh varieties), potato, salmon (AquAdvantage®), soybean, squash (summer), and sugarbeet." 7 C.F.R. § 66.6. AMS committed to updating the list as warranted on an annual basis. *Id.* § 66.7. A highly refined food produced with a listed item as an ingredient is presumed to require disclosure, and would be exempted only if the regulated entity proved that the product is not bioengineered. 83 Fed. Reg. at 65818-19, 65826; 7 C.F.R. §§ 66.5, 66.6, 66.9; *see also* Dkt. No. 56 at 5 ("A crop or food included on the List or a food made from or with an item on the List requires disclosure unless a regulated entity has records demonstrating that its food product is not bioengineered (*e.g.* is organic or does not contain detectable modified genetic material)."). In sum, AMS determined that highly refined foods would not be subject to the disclosure statute and regulations unless: (1) they had detectable amounts of modified genetic material; or (2) they included ingredients from the presumed bioengineered list and the regulated entity did not prove that the food was not bioengineered.

AMS concluded that this approach would likely be overinclusive. 83 Fed. Reg. at 65826 ("While we acknowledge that this framework may result in regulated entities placing a BE disclosure on a food that they do not know with certainty is bioengineered, we believe that it is appropriate to err on the side of disclosure to provide consumers with the fullest information about food that could be bioengineered."). AMS also concluded that many highly refined foods may not require a bioengineering disclosure even with the use of a listed ingredient because "the refining process removes the genetic material so that it can no longer be detected. If the genetic material is not detected, then it is not possible to conclude that the food product or ingredient contains modified genetic material." *Id.* at 65834.

### III.   PLAINTIFFS' LAWSUIT

Plaintiffs filed this lawsuit approximately 18 months after AMS published the final regulations. Dkt. No. 1. The amended complaint alleges that the regulations concerning the text message disclosure, mandatory disclosure terminology, and the definition of bioengineering, are not in accordance with law and are arbitrary and capricious under the Administrative Procedure Act. Dkt. No. 19 ¶¶ 133-42, 205-10, 271-79. Plaintiffs also say that the disclosure statute and the

regulations violate the First and Fifth Amendments to the Constitution by limiting their freedom to use words other than "bioengineered" in communications with consumers.  *Id.* ¶¶ 317-33, 392-401.  To be clear, plaintiffs do not bring a constitutional challenge to the mandatory use of specific words in the standardized disclosures.  They object only that the regulations, in their view, do not let them say more.  Plaintiffs also contend that the preemption of state labeling laws for GE seeds violates the Tenth Amendment.  *Id.* ¶¶ 361-67.

## DISCUSSION

## IV.   LEGAL STANDARDS

The standard of review for claims brought under the APA is well established.  *See, e.g.*, *Ecological Rts. Found. v. FEMA*, 384 F. Supp. 3d 1111, 1118-19 (N.D. Cal. 2019).  An agency action will be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1256-57 (9th Cir. 2017).  An agency decision is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Defenders of Wildlife*, 856 F.3d at 1257 (internal quotations omitted).  "An agency decision construing a statute is not in violation of the APA where the agency accurately applies an unambiguous statute, or permissibly construes an ambiguous statute, and its conclusion is 'well supported by substantial evidence in the record.'"  *Corrigan v. Haaland*, 12 F.4th 901, 906 (9th Cir. 2021) (internal quotations omitted).  "The Court's deference extends to less than stellar work by an agency, so long as its analytical path and reasoning can be reasonably discerned."  *Ecological Rts. Found.*, 384 F. Supp. 3d at 1119 (citing *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 627 (9th Cir. 2014)).  Neither party here has suggested that the regulations present an issue under the major questions doctrine, and the Court has independently concluded that they do not.  *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609-10 (2022).

The Court will not substitute its own judgment for that of the agency, but will "engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on

the record before it." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010)

(internal quotations omitted).  The Court will not "rubber-stamp" agency decisions that are

"inconsistent with a statutory mandate or that frustrate the congressional policy underlying a

statute." *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (internal

quotations omitted).

Summary judgment is an appropriate procedure for deciding challenges under the APA.

*See, e.g.*, *Ecological Rts. Found.*, 384 F. Supp. 3d at 1119.  Summary judgment may be granted

when there is no genuine issue of material fact and the moving party is entitled to judgment as a

matter of law.  *Brickman v. Fitbit, Inc.*, No. 3:15-cv-02077-JD, 2017 WL 6209307, at *2 (N.D.

Cal. Dec. 8, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  Because this is

a record review case, the summary judgment motion will be decided upon a review of the

administrative record as it existed at the time of the agency's decision.  *Karuk Tribe of Cal. v. U.S.

Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc); *Jewell*, 747 F.3d at 602 (quoting

*Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  In so doing, the Court relies on the portions of the

record that the parties have cited and argued.  It is not the Court's task to "scour the record in

search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

(internal quotations omitted).  Extra-record materials and "post-hoc rationalizations" for or against

the agency's decision will not be considered for the merits of the APA claims.  *Jewell*, 747 F.3d at

602-03.  Plaintiffs' declarations, Dkt. Nos. 54-1 to 54-16, are not part of the administrative record

and were considered only for purposes of determining plaintiffs' standing to sue.  *Ecological Rts.

Found.*, 384 F. Supp. 3d at 1119.

## V.    STANDING

As is true in all federal cases, the "case or controversy" requirement of Article III of the

Constitution "limits federal courts' subject matter jurisdiction by requiring, inter alia, that

plaintiffs have standing."  *Chandler v. State Farm Mut. Auto. Ins.*, 598 F.3d 1115, 1121 (9th Cir.

2010).  "[A] plaintiff must demonstrate standing to sue by alleging the 'irreducible constitutional

minimum' of (1) an 'injury in fact' (2) that is 'fairly traceable to the challenged conduct of the

defendants' and (3) 'likely to be redressed by a favorable judicial decision.'"  *Patel v. Facebook*

United States District Court
Northern District of California

1   *Inc.*, 290 F. Supp. 3d 948, 952 (N.D. Cal. 2018) (quoting *Spokeo*, *Inc. v. Robins*, 578 U.S. 330,

2   338 (2016)).  An injury in fact is demonstrated when the plaintiff has "suffered 'an invasion of a

3   legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

4   conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*,

5   504 U.S. 555, 560 (1992)). "Standing is an ongoing inquiry, and '[t]he need to satisfy these three

6   [Article III standing] requirements persists throughout the life of the lawsuit.'"  *Trump v. Twitter,*

7   *Inc.*, ___ F. Supp. 3d ___, 2022 WL 1443233, at *7 (N.D. Cal. May 6, 2022) (quoting *Lujan*, 504

8   U.S. at 560-61).  "A plaintiff must establish standing with the 'manner and degree of evidence

9   required at the successive stages of the litigation.'"  *Carrico v. City & Cnty. of San Francisco*, 656

10  F.3d 1002, 1006 (9th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561).

11          The government challenges plaintiffs' standing to sue only with respect to the First and

12  Fifth Amendment claims.  *See* Dkt. No. 56 at 30, 36-37.  Even so, "[t]he Court has an independent

13  duty to be vigilant about standing," *Trump*, 2022 WL 1443233, at *7, and will determine standing

14  "claim by claim" for the amended complaint.  *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d

15  918, 924 (N.D. Cal. 2015) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

16          **A.      APA Standing**

17          Plaintiffs have demonstrated standing to sue under the APA, and the government does not

18  contend otherwise.  The retail store plaintiffs, namely Natural Grocers, Good Earth Natural Foods,

19  and Puget Consumers Co-op, filed multiple declarations attesting to their stake in disclosing

20  information about bioengineered foods to interested consumers, and how the regulations are said

21  to adversely affect the stores.  *See* Dkt. Nos. 54-1, 54-7, 54-9.  Several members of the advocacy

22  group plaintiffs, Center for Food Safety, Rural Vermont, Citizens for GMO Labeling, Label

23  GMOs, and National Organic Coalition, filed declarations describing their organizational interests

24  in transparent labeling of bioengineered foods, their individual interests in obtaining information

25  about bioengineered foods, and how the regulations are said to impede those interests by

26  restricting the scope of disclosures.  *See* Dkt. Nos. 54-2, 54-3, 54-4, 54-5, 54-6, 54-11, 54-12, 54-

27  13, 54-14, 54-15, 54-16.

28

United States District Court
Northern District of California

These alleged injuries are concrete, fairly traceable to the agency's conduct, and redressable by the Court, and so they establish constitutional standing for the APA claims. Plaintiffs also have statutory standing under the APA because they fall squarely "within the zone of interests" protected by the disclosure statute. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1177 (9th Cir. 2004) (internal quotations omitted).

### B.        First and Fifth Amendment Standing

For the constitutional speech claims, plaintiffs who are regulated entities contend that the mandatory terminology regulations muzzle their right to speak freely about bioengineered foods. *See* Dkt. No. 54 at 24-25; Dkt. No. 58 at 16-17.  Several of the plaintiffs, namely the food advocacy groups, are not regulated entities, and suggest that a right to receive information is impaired by the chilling effect on regulated entities.  *See* Dkt. No. 54 at 23 n.40 ("Customers of Plaintiff retailers have standing because when there is a right to disseminate commercial information, their customers have a reciprocal 'listeners'' right to receive the information.").  The standing analysis for the regulated entities establishes that they have no reasonable fear of enforcement or restraint, which also vitiates the listener theory.

"First Amendment challenges present unique standing considerations." *Italian Colors Restaurant v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) (internal quotations omitted).  When, as is alleged here, "a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the statute will be enforced." *Barke v. Banks*, 25 F.4th 714, 718 (9th Cir. 2022) (internal quotations omitted).

Three factors determine whether a plaintiff faces a "credible threat of enforcement." *Id.* at 718-19.  They are:  "1) the likelihood that the law will be enforced against the plaintiff; 2) whether the plaintiff has shown, with some degree of concrete detail, that she intends to violate the challenged law; and 3) whether the law even applies to the plaintiff." *Id.* at 719 (internal quotations omitted).  "[C]laims of future harm lack credibility when the challenged speech restriction by its terms is not applicable to the plaintiffs, or the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs." *Lopez v. Candaele*, 630 F.3d 775, 788

1    (9th Cir. 2010).  The "inquiry into injury-in-fact does not turn on the strength of plaintiffs'

2    concerns about a law, but rather on the credibility of the threat that the challenged law will be

3    enforced against them."  *Id.* at 792.  The same standing rules apply to pre-enforcement plaintiffs

4    who allege vagueness challenges under the Fifth Amendment.  *Carrico*, 656 F.3d at 1006.

5         Plaintiffs' main speech challenge goes to the use of terms such as GE, GMO, and the like.

6    The retail store plaintiffs say they have refrained from labeling foods with GE and GMO out of

7    fear that the disclosure statute and the regulations prohibit the use of language other than

8    "bioengineered."  Dkt. No. 54 at 23-25.  Plaintiffs also say that the regulations are impermissibly

9    vague because the statute states that "similar terms" may be incorporated in the definition of

10   bioengineering, but the regulations prohibit them.  *Id.* at 27.  The retail store plaintiffs are said to

11   have suffered economic and reputational injuries as a result because they terminated plans to label

12   foods as GE or GMO or removed such labels from their stores out of fear that the labels violated

13   the disclosure statute and the regulations.  *See* Dkt. No. 54-1 ¶¶ 20-21, 24, 27; Dkt. No. 54-7 ¶¶ 4,

14   17-18; Dkt. No. 54-9 ¶¶ 7, 14-15.

15        These points are not well taken.  To start, plaintiffs misconstrue the plain language of the

16   statute and the regulations.  Nothing in either text forbids the plaintiffs from using GE, GMO, or

17   any other words they want in their communications with consumers.  The only requirement is that

18   all disclosures must use the word "bioengineered."  7 C.F.R. §§ 66.102, 66.104.  This is the whole

19   purpose of the disclosure statute:  the use of standardized language to ensure that consumers get

20   the same baseline information about bioengineered food irrespective of where they buy it, or from

21   whom.  After that, plaintiffs are perfectly free to speak their minds in any manner they choose.

22   The regulations spelled this out by stating that "nothing in the final rule prohibits regulated entities

23   from providing additional statements or other claims regarding bioengineered foods and

24   bioengineered food ingredients, so long as such statements are consistent with all other applicable

25   laws and regulations."  83 Fed. Reg. at 65852; *see also* 7 C.F.R. § 66.118.  The government has

26   expressly affirmed that, "[a]s long as regulated entities use those standard terms, they are permitted

27   to 'mak[e] other claims regarding bioengineered foods,' including Plaintiffs' preferred terms

28   'produced with genetic engineering,' 'genetically engineered,' or 'GMO' on their disclosures," so

United States District Court
Northern District of California

13

1  long as the claims are consistent with federal law.  *See* Dkt. No. 56 at 28 (quoting 7 C.F.R.

2  § 66.118).

3       Plaintiffs have not demonstrated otherwise.  They say that the government's statement is

4  nothing more than a "convenient, 11th hour" litigation position, but this fails to account for the

5  plain language of the regulations to the same effect.  *See* Dkt. No. 58 at 17.  Plaintiffs also did not

6  proffer any evidence indicating that "they have ever been threatened with prosecution, that a

7  prosecution is likely, or even that a prosecution is remotely possible."  *Lopez*, 630 F.3d at 787

8  (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1972)).  "Mere allegations" of a "subjective chill,"

9  which is all plaintiffs have tendered here, are not a substitute for establishing a likelihood of an

10  injury in fact.  *Id.* (internal quotations omitted).

11       Overall, the record does not establish that plaintiffs face a well-founded fear of

12  enforcement for using GE, GMO, or any other words above and beyond the mandatory disclosure

13  terminology.  Consequently, they do not have standing to challenge the statute or regulations on

14  First or Fifth Amendment grounds.  *See Barke*, 25 F.4th at 718-19.

15       The same goes for plaintiffs' ancillary speech challenges.  They object to a provision that

16  prohibits labeling meat or dairy products as bioengineered solely because the products were

17  derived from livestock fed GE feed.  *See* 7 U.S.C. § 1639b(b)(2)(A); 7 C.F.R. § 66.5(d)); *see also*

18  Dkt. No. 54 at 24-25.  Plaintiffs again have not shown a well-founded fear of enforcement because

19  they did not demonstrate concrete plans to use a "bioengineered" label on any meat or dairy

20  products.  *See* Dkt. No. 54-1 ¶¶ 24, 26; Dkt. No. 54-7 ¶ 15; Dkt. No. 54-9 ¶ 13.  This devitalizes

21  their standing to sue.  *See Lopez*, 630 F.3d at 787 ("Because the Constitution requires something

22  more than hypothetical intent to violate the law, plaintiffs must articulate a concrete plan to violate

23  the law in question by giving details about their future speech such as when, to whom, where, or

24  under what circumstances.") (internal quotations omitted).

25       Plaintiffs also object that the regulations prohibit use of the phrase "may be

26  bioengineered."  *See* 83 Fed. Reg. at 65827 ("The 'may be bioengineered' disclosure cannot be

27  used."); *see also* Dkt. No. 54 at 24-25.  Some of the plaintiffs said that they might like to use "may

28  be bioengineered" on labels in their stores, *see* Dkt. No. 54-1 ¶¶ 22, 27; Dkt. No. 54-7 ¶ 16, but

United States District Court
Northern District of California

14

such "some day intentions" are not the stuff of constitutional standing. *Lopez*, 630 F. 3d at 787-88 (internal quotations omitted). Plaintiff Puget Consumers Co-op said that it had devoted substantial effort to an in-store labeling plan for GE/GMO foods that included "may be bioengineered" language, *see* Dkt. No. 54-9 ¶¶ 12-13, 19, but undercut that claim substantially by opining that "bioengineered" is deceptive and that it would not use the phrase with customers. *Id.* ¶ 15 ("[R]ather than using the labeling plan PCC worked on for six years, with the clearly recognized and widely accepted and understood terms of 'GE' or 'GMO' for foods with identified genetically engineered ingredients, the Disclosure Standard forces PCC to use the unknown terminology, 'bioengineered' … 'GE' and 'GMO' are the terms that our members know, so using the label, 'bioengineered,' will simply not pass the information to our members in a useful, clearly understandable way."). This does not demonstrate a "concrete intent to violate the challenged law" and consequently does not establish a credible threat of enforcement. *Lopez*, 630 F.3d at 787.

### C.      Tenth Amendment Standing

Private plaintiffs who "suffer otherwise justiciable injury" have standing to challenge laws under the Tenth Amendment when "the constitutional structure of our Government that protects individual liberty is compromised." *Bond v. United States*, 564 U.S. 211, 223 (2011). Plaintiffs presented evidence that they will have paid premiums for organic seeds to avoid purchasing unlabeled GE seeds after the disclosure statute invalidated state-level GE seed labeling laws. *See* Dkt. No. 54-4 ¶ 20; Dkt. No. 54-5 ¶ 14; Dkt. No. 54-6 ¶¶ 13-14; Dkt. No. 54-11 ¶ 11. These economic injuries confer standing, which the government does not oppose. *See Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142, 1152 n.7 (9th Cir. 2020) (private plaintiffs had standing pursuant to *Bond*, 564 U.S. at 220-21, to challenge a federal statute under the Tenth Amendment).

## VI.      THE APA CLAIMS

### A.      Electronic and Text Message Disclosure Options

Plaintiffs object to the USDA's decision to provide a text message disclosure option in the regulations as contrary to the disclosure statute's command to "provide additional and comparable

1     options to access the bioengineering disclosure," and consequently unlawful under the APA.

2     7 U.S.C. § 1639b(c)(4); 5 U.S.C. § 706(2)(A).  The record establishes that it was.

3              As in all questions of statutory interpretation, "[o]ur analysis begins and ends with the

4     text."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014).  The Court

5     gives Congress's words their ordinary and every day meaning, and may consult dictionary

6     definitions to ensure a plain interpretation.  *City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th

7     Cir. 2019).  The "inquiry must cease if the statutory language is unambiguous" and "the statutory

8     scheme is coherent and consistent."  *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563

9     U.S. 401, 412 (2011) (internal quotations omitted).  It is also a "fundamental canon of statutory

10    construction" to define words in reference to "context" and "the overall statutory scheme."  *FDA

11    v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (internal quotations

12    omitted).

13             "When construing a statute, a virtuoso feat of analysis is neither required nor particularly

14    useful."  *Michigan v. DeVos*, 481 F. Supp. 3d 984, 991 (N.D. Cal. 2020).  The ultimate goal of

15    statutory construction is to effectuate Congress's intent in enacting the statute.  "In every case, 'it

16    is the intent of Congress that is the ultimate touchstone.'"  *Barr*, 941 F.3d at 940 (quoting *Arizona

17    v. United States*, 567 U.S. 387, 453 (2012) (Alito, J., concurring in part and dissenting in part)).

18    The Court bears "the conventional judicial duty to give faithful meaning to the language Congress

19    adopted in the light of the evident legislative purpose in enacting the law in question."  *Graham

20    Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 298 (2010)

21    (internal quotations omitted).

22             The language Congress used in Section 1639b(c) of the disclosure statute is

23    straightforward.  It directed the USDA to conduct a study "to identify potential technological

24    challenges that may impact whether consumers would have access to the bioengineering

25    disclosure through electronic or digital disclosure methods."  7 U.S.C. § 1639b(c)(1).  No feat of

26    analysis is necessary to conclude that Congress was especially concerned about whether

27    consumers would be able to access bioengineering information through the electronic disclosure.

28    The same subsection of the disclosure statute also required USDA to "provide additional and

comparable options to access the bioengineering disclosure" if it determined "that consumers, while shopping, would not have sufficient access to the bioengineering disclosure through electronic or digital disclosure methods." *Id.* § 1639b(c)(4).  In mandating a study on the accessibility of the electronic disclosure, and directing the USDA to act only if the electronic disclosure was determined to be inaccessible, Congress clearly intended for the USDA to provide "additional and comparable options" to improve the accessibility of the electronic disclosure method.

AMS's decision to provide a separate text message disclosure option did nothing to fix the problem of inaccessible electronic disclosures.  It merely provided a fourth disclosure option that regulated entities can select *instead of* the electronic disclosure method.  *See* 7 C.F.R. § 66.100(b) (stating "the disclosure must be in one of the forms described in this paragraph (b)," and listing the text disclosure, symbol disclosure, electronic disclosure, and text message disclosure as separate options).  The result is that the standalone electronic disclosure suffices under the regulations, even though USDA "determined that consumers would not have sufficient access to the bioengineering disclosure through electronic or digital means under ordinary shopping conditions at this time." 83 Fed. Reg. at 65828.

The government says AMS acted appropriately because it "adopted the study's recommendation to provide food manufacturers with an additional option of disclosing the bioengineering information via text message, a method that is comparable to the electronic or digital link method." Dkt. No. 56 at 18.  It says the words "additional and comparable options" only obligated AMS to provide "similar" disclosure options rather than improvements on the electronic disclosure.  *Id.*  These arguments are not consonant with the rest of Section 1639b(c), which expressly addresses whether consumers can access the electronic disclosure at all.  Congress mandated a study on "whether consumers would have access to the bioengineering disclosure through electronic or digital disclosure methods" precisely to ensure that those methods were accessible and would achieve the goal of disclosure.  *See* 7 U.S.C. § 1639b(c)(1).

The Deloitte Consulting study also undercuts the government's arguments.  The study determined that access problems abounded.  Among other findings, it concluded that "key

technological challenges" prevented "nearly all participants" from accessing bioengineering information electronically.  AR250046.  The study found that "[t]houghtful action can improve access for consumers facing technological challenges," and identified specific "[o]ffline options" that could "provide greater access for populations who lack smartphones or broadband." AR250110-11.  It recommended that, "[a]s the Law already requires that the electronic disclosure is accompanied by a telephone number," the number could call into an automated recording that would provide consumers with "24-hour disclosure information."  AR250111.  It also recommended that "packages could include a text message alternative for consumers who have access to a mobile phone."  *Id.*  AMS partly adopted this recommendation by requiring that the telephone number that accompanies the electronic disclosure must provide access to the bioengineered food disclosure "regardless of the time of day."  *See* 7 C.F.R. § 66.106(a)(2).  But the agency failed to take the next step of adding "additional and comparable options," like the alternative text message instructions, to the electronic disclosure.  *See* 7 U.S.C. § 1639b(c)(4).

The government tries to defend this inaction by suggesting that adding more requirements to the electronic disclosure "would narrow rather than expand the disclosure options for food manufactures" and "rewrite the [disclosure statute] to require AMS to effectively *eliminate* the electronic or digital link option mandated by Congress, rather than providing an *additional* and comparable option for labeling."  Dkt. No. 56 at 19 (emphasis in original).  Not so.  The statute already requires that the electronic disclosure be accompanied by a telephone number and by "on-package language" indicating that the link and the telephone number will provide access to "more food information."  7 U.S.C. §§ 1639b(d)(1), (4).  In addition, nothing in the statute permitted AMS to expand the disclosure options for manufacturers beyond the "text, symbol, or electronic or digital link" choices.  *Id.* § 1639b(b)(2)(D).  It may be that many retailers and manufacturers supported the standalone text message disclosure option, as the government notes.  Dkt. No. 56 at 21; *see also* 83 Fed. Reg. at 65855-56; AR183199; AR183707; AR233404-05.  But that did not relieve AMS of the obligation to comply with Congress's express direction to "provide additional and comparable options to access the bioengineering disclosure."  7 U.S.C. § 1639b(c)(4).

The government also suggests that the agency's interpretation of Section 1639b(c)(4) is entitled to deference.  Dkt. No. 56 at 20-22. "[C]ourts 'often apply the two-step framework announced in'" *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), "to determine the validity of an agency's interpretation of a statute." *DeVos*, 481 F. Supp. 3d at 993 (quoting *King v. Burwell*, 576 U.S. 473, 485 (2015)).  "This approach is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *King*, 576 U.S. at 485 (internal quotations omitted).  When the statute is ambiguous, courts will defer to the agency's interpretation.  *Chevron*, 467 U.S. at 843.

The problem for the government is that it cannot make it past step one, which asks whether the statute is ambiguous.  When Congress has spoken clearly, as it did in Section 1639b(c)(4) of the disclosure statute, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Corrigan*, 12 F.4th at 907 (internal quotations omitted).  "An executive agency . . . has no authority to rewrite Congress's plain and unambiguous commands under the guise of interpretation, and no deference is owed when an agency acts in contravention of a statute." *DeVos*, 481 F. Supp. 3d at 993 (citing *Chevron*, 467 U.S. at 842-43).

Consequently, plaintiffs have carried their burden of showing that AMS's decision to implement a standalone text message disclosure option was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

For the question of a remedy, the Court will set aside an action "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*.  Remand with vacatur is the typical remedy in these circumstances, unless the government establishes why another remedy, such as remand without vacatur, is a better result. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018).  Whether remand without vacatur is appropriate "depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (internal quotations omitted).

The text message disclosure decision was a significant error, but the government urges a remand without vacatur so that the status quo is maintained while AMS revisits the issue.  Dkt. No. 56 at 39-40.  It says that vacatur would disrupt consumer access to bioengineering disclosures and exacerbate the very concerns implicated by the agency's error.  *Id.*  It also says that vacatur would disrupt the food industry, which was required to comply with the regulations as of January 1, 2022.  *Id.*; 83 Fed. Reg. at 65814.

These are legitimate and persuasive concerns, and plaintiffs have not demonstrated otherwise.  Consequently, Sections 66.106 and 66.108 of the regulations are remanded without vacatur to AMS for further consideration in a manner consistent with this order.

### B.      Mandatory Disclosure Terminology

Although plaintiffs lack standing to challenge the regulations for the mandatory disclosure terminology under the First and Fifth Amendments, they may challenge the regulations under the APA.  Plaintiffs say that mandating the use of "bioengineered" in disclosures was contrary to the statutory directive to define "any similar term," which plaintiffs construe as requiring terms other than just "bioengineered."  *See* Dkt. No. 54 at 15-16; 7 U.S.C. § 1639(1).  Plaintiffs also say that the decision was arbitrary and capricious because the term bioengineered is inconsistent with the agency's past use of terms like GE and GMO, and is potentially misleading to consumers.  *See* Dkt. No. 54 at 16-18.

None of these contentions is tenable.  The statute authorized the USDA to supplement the definition of bioengineering with "any similar term, as determined by the [USDA]."  7 U.S.C. § 1639(1).  This is wholly distinct from the disclosure requirements in Section 1639b.  Nothing in either section indicates that Congress intended to require that "any similar term" be part of the mandatory disclosure language, and the Court will not strain to find such a hidden meaning when Congress could easily have conveyed such a clear directive.  *See Corrigan*, 12 F.4th at 910.

Plaintiffs' arbitrary and capricious arguments are equally unavailing.  To start, the use of the term bioengineered cannot be characterized as a change in practice or policy because the disclosure statute and regulations are the first federal actions implementing standards for bioengineered food disclosures.  It is true that some of the evidence before AMS indicated that

consumers are more familiar with terms like GE and GMO than bioengineered.  *See, e.g.*, AR17667; AR95879-80; AR178749-50.  But AMS considered GE and GMO for use in the mandatory disclosure terminology, and ultimately determined that those terms could blur the scope of the regulations, and lead to inconsistent disclosures.  83 Fed. Reg. at 65837, 65851.  The decision was reasoned and reasonable, and plaintiffs have not shown that it was arbitrary or capricious in any way.

### C.   "Bioengineering" and Highly Refined Foods

Plaintiffs' other APA challenge concerns the agency's definition of "bioengineering," which excludes foods without "detectable" modified genetic material.  7 C.F.R. § 66.1.  Plaintiffs say that this exemption is overbroad and does not regulate "any food that *may* be bioengineered," as the disclosure statute requires.  7 U.S.C. § 1639b(a)(1) (emphasis added); *see also* Dkt. No. 54 at 19-20.  Plaintiffs also say that the agency's decision to adopt an exclusion based on whether modified genetic material is "detectable" was arbitrary and capricious because some studies have identified previously "undetectable" modified genetic material in highly refined foods.  Dkt. No. 54 at 21-22.  Plaintiffs add that AMS arbitrarily and capriciously ignored evidence indicating that consumers are more concerned about whether foods are produced through bioengineering technology than whether modified genetic material is detectable in the final food product.  *Id.* at 22-23.

These objections are not well taken.  As discussed in Section II.C above, the regulations are much less exclusionary than plaintiffs suggest because AMS augmented the definition of bioengineering with the "List of Bioengineered Foods."  83 Fed. Reg. at 65818-19, 65826; 7 C.F.R. § 66.6.  The list identifies a number of foods known to be bioengineered, and a refined food that contains an item from the list is presumed to be bioengineered and so require disclosure.  83 Fed. Reg. at 65826, 65834.  The food may escape the disclosure requirement only if the regulated entity provides records demonstrating that it is not bioengineered.  *Id.*; 7 C.F.R. § 66.9.  As AMS stated, the framework is designed to be overinclusive and "err on the side of disclosure to provide consumers with the fullest information about food that could be bioengineered."  83 Fed. Reg. at 65816-17, 65826.

None of this was arbitrary and capricious. The statute expressly states that the agency "shall" promulgate regulations that "determine the amounts of a bioengineered substance that may be present in a food, as appropriate, in order for the food to be a bioengineered food." 7 U.S.C. § 1639b(b)(2)(B). AMS did just that. *See* 7 C.F.R. § 66.9 (listing recordkeeping requirements to prove that modified genetic material is not detectable and "[s]tandards of performance for detectability testing"). It may be, as plaintiffs suggest, that future testing methods will be able to better detect modified genetic material in highly refined foods, *see* Dkt. No. 54 at 21-22, but that does not mean the regulations are defective because the current state of testing cannot exhaustively capture all foods that "may" contain bioengineered components. To the contrary, it would be wrong for an agency to require results impossible to obtain with existing technology.

In addition, AMS did not ignore the likelihood of progress, and committed to updating the List of Bioengineered Foods on an annual basis. 83 Fed. Reg. at 65834 ("If the modified genetic material in [a] food ingredient becomes detectable under § 66.9 in the future, the food ingredient would be subject to BE disclosure."); *see also* 7 C.F.R. § 66.7(a). AMS also concluded, based on multiple studies, that "for many refined food products and ingredients, the refining process removes the genetic material so that it can no longer be detected." 83 Fed. Reg. at 65833-34. AMS ultimately determined that "the products of technology, rather than the technology itself, should determine whether a food meets the BE food definition and requires disclosure." *Id.* at 65834. Plaintiffs do not seriously dispute this observation.

Overall, the record with respect to the mandatory disclosure language and highly refined foods does not show that AMS "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defenders of Wildlife*, 856 F.3d at 1257 (internal quotations omitted). Consequently, the agency's actions were not in violation of the APA.

## VII.   THE TENTH AMENDMENT CLAIM

Plaintiffs' final challenge is to the preemption of state labeling requirements for GE seeds, *see* 7 U.S.C. § 1639i(b), which is said to violate the Tenth Amendment's guarantee that "[t]he

United States District Court
Northern District of California

powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."  U.S. Const. amend. X; *see also* Dkt. No. 54 at 28-29.  For this claim, plaintiffs rely primarily on the anticommandeering doctrine developed in Tenth Amendment jurisprudence, particularly as discussed in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).  *See* Dkt. No. 54 at 28-29.

"The anticommandeering doctrine may sound arcane, but it is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.,* the decision to withhold from Congress the power to issue orders directly to the States."  *Murphy*, 138 S. Ct. at 1475.  The basic principle is that when "a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents."  *Id*. at 1477 (quoting *New York v. United States,* 505 U.S. 144, 178 (1992)).  Put plainly, Congress cannot order a state to require or prohibit certain acts, or enact laws to those ends.  *Id*. at 1476-77.  A classic application of the doctrine is found in *New York*, 404 U.S. at 174-76, which struck down a federal statute that required states to enact laws for radioactive waste according to the instructions of Congress.  As the Supreme Court stated, the Constitution "confers upon Congress the power to regulate individuals, not States."  *Id*. at 166.

As *New York* indicates, the anticommandeering doctrine does not serve to protect the sovereignty of the states for the benefit of the states themselves.  "To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals" and their liberty.  *Murphy*, 138 S. Ct. at 1477 (quoting *New York*, 404 U.S. at 181).  This is accomplished by ensuring a "healthy balance" between state and federal power, which moderates the "risk of tyranny and abuse from either front."  *Id*. (quotation omitted).

None of this is particularly germane to the GE seed labeling provision in Section 1639i(b) of the disclosure statute, and for good reason.  The plain text of Section 1639i(b) demonstrates that it is not an attempt by Congress to order the states to do something.  *See* 7 U.S.C. § 1639i(b).  Rather, Section 1639i(b) is a typical federal preemption provision no different from similar provisions in many other federal statutes.

United States District Court
Northern District of California

Preemption is based on the Supremacy Clause, U.S. Const. art. VI cl. 2, and a federal statute may preempt state law without offending the Tenth Amendment. *Murphy*, 138 S. Ct. at 1479. To preempt state law, a federal statute must (1) "represent the exercise of a power conferred on Congress by the Constitution," and (2) "be best read as one that regulates private actors." *Id.*; *see also City of Portland v. United States*, 969 F.3d 1020, 1049 (9th Cir. 2020), *cert. denied, sub nom. City of Portland, Ore. v. FCC*, 141 S. Ct. 2855 (2021) (rejecting a Tenth Amendment challenge because the FCC issued regulations pursuant to authority delegated from Congress under the Commerce Clause and the regulations operated on private entities).

For the first element, plaintiffs do not dispute that the disclosure statute as a whole, including Section 1639i(b), is a valid exercise of Congress's power under the Commerce Clause. *See* Dkt. No. 58 at 18. They even go so far as to agree that Section 1639i(b) properly preempts state GE food labeling laws. *See id.*

For the second element, plaintiffs overread the opening words of Section 1639i(b) that "[n]o State or a political subdivision of a State may" establish GE seed labeling requirements. 7 U.S.C. § 1639i(b). The Supreme Court has expressly cautioned that "[t]his language might appear to operate directly on the States, but it is a mistake to be confused by the way in which a preemption provision is phrased." *Murphy*, 138 S. Ct. at 1480. *Murphy* observed that the Airline Deregulation Act of 1978 contained nearly exactly the same formulation to preempt state regulation of airline rates, routes, and services. *Id.* ("[T]he Act provided that 'no State or political subdivision thereof … shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier.'") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992)). Even so, the Court had no trouble concluding "it is clear that this provision operates just like any other federal law with preemptive effect" by conferring "on private entities (*i.e.*, covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.*

So too, here. Section 1639i(b) of the disclosure statute confers on suppliers of GE seeds the right to be free of a patchwork of state laws. 7 U.S.C. § 1639i(b). This manifests Congress's intent to set national standards and practices for disclosures about bioengineered foods. *See*

24

AR248811 ("The purpose of the bill is to preempt state and local actions that mandate labeling of whether a food or seed is genetically engineered, and establish a mandatory uniform national disclosure standard for human food that is or may be bioengineered.").

Plaintiffs' main response is that federal law currently does not have specific provisions for the labeling of GE seeds. *See* Dkt. No. 58 at 18-19. In effect, plaintiffs say that preemption is valid only if Congress has enacted federal laws in the area. But that is not an element of preemption stated in *Murphy*. In addition, the preemption clause in the Airline Deregulation Act was enacted precisely "[t]o ensure that the States would not undo federal deregulation with regulation of their own." *Murphy*, 138 S. Ct. at 1480 (quoting *Morales*, 504 U.S. at 378). The petitioner in *Morales* made a similar objection that the Airline Deregulation Act did not have the "comprehensive" federal regulatory scheme of statutes with preemption clauses, such as ERISA, but the Supreme Court did not reject preemption on that ground. 504 U.S. at 384. Plaintiffs have not shown that a different result is warranted here.

### CONCLUSION

Summary judgment is granted to plaintiffs on the APA claim for the text message regulation, and Sections 66.106 and 66.108 of the regulations are remanded to the USDA without vacatur for reconsideration in light of this order. Summary judgment is denied in all other respects.

**IT IS SO ORDERED.**

Dated: September 13, 2022

_____
JAMES DONATO
United States District Judge